CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
7/29/2020
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| MARTHA LOU R. DERRICK, *et al.*, <br><br>    *Plaintiffs,* <br><br> v. <br><br> LINCOLN NATIONAL LIFE INSURANCE COMPANY, <br><br>    *Defendant.* | CASE NO. 6:18-cv-00085 <br><br> MEMORANDUM OPINION <br><br> JUDGE NORMAN K. MOON |

This matter is before the Court on Defendant Lincoln National Life Insurance Company's ("Lincoln") motion for summary judgment. Dkt. 20. Plaintiffs, H.E. Derrick, Jr., the holder of a lapsed life insurance policy with Lincoln, and Martha Lou R. Derrick, the policy's sole beneficiary, brought suit against Lincoln and its purported agent Steven Crawford, alleging constructive fraud in the inducement based on representations relied on by the Derricks in agreeing to the policy. Dkt. 1-1. Plaintiffs seek injunctive relief in the form of either the policy's reinstatement or return of the $622,903.05 paid into the plan before it lapsed and was rendered worthless. *Id.* Lincoln argues that no reasonable trier of fact could find in the Derricks' favor on their constructive fraud claim, and in any event, several procedural defects warrant the suit's dismissal. Dkt. 20.

The Court will award Lincoln summary judgment. The Derricks cannot show that Crawford's statements to them constituted false representations of material fact, and thus they cannot prove a necessary element of their constructive fraud claim. Additionally, the Derricks make no allegation that Crawford breached any statutory or common law duty owed to the Derricks, another necessary showing to prevail on a constructive fraud claim. For both these

reasons, Lincoln is entitled to summary judgment irrespective of any procedural faults in the Derricks' case.

## I. Undisputed Facts

In March of 2001, H.E. Derrick, a businessman and the former mayor of Lexington, Virginia, owned three life insurance policies—two term policies with Zurich and a whole life policy with Equitable—for whom his wife Martha Lou, a former college instructor, was the sole beneficiary. Dkt. 20-1 at 5; H. Derrick Dep. 33:13-22. These policies had a combined death benefit of approximately $780,000, and he paid a combined total of $1,677 per month in premiums. Dkt. 20-7.

On March 21, 2001, the Derricks met with Steven Crawford, an insurance agent with whom the Derricks had dealt before, about replacing their three policies with a single policy with Jefferson Pilot Financial Insurance Company ("Jefferson Pilot"). Dkt. 21 at 1–2. According to Crawford, he suggested a flexible premium variable life insurance policy, which offers a traditional life insurance death benefit while also featuring an investment aspect that allows the policyholder to earn a rate of return depending on market performance. Crawford Dep. 90:22-91:21, 93; Muse Dep. 7:17-16:25. The policy is funded both through premiums and, ideally, investment returns. *Id.* Crawford told the Derricks that such a policy should allow the Derricks to earn a similar death benefit without changing what they currently paid in premiums. Dkt. 21 at 2. Specifically, Crawford "advised the Derricks that the $1,667.00 planned periodic payment was likely sufficient to maintain the Policy benefits through the time of H.E. Derrick, Jr's death." Dkt. 20-45 at 2; Dkt. 21 at 2. And he "further advised the Derricks that, in the event additional premiums were required, the increases should not be substantial." *Id.* Crawford told the Derricks that his advice was "based on decades of extensive experience selling life insurance products." *Id.*

The parties provided a specimen copy of the life insurance plan signed by the Derricks, and its accuracy does not appear to be in dispute. Dkt. 20-15. The policy states that there are no fixed or minimum premiums, but that payment of premiums selected by the Derricks would not guarantee the policy would remain in force. Dkt. 20-15 at 3, 10. The policy also provides that the cost of insurance and other expenses would be charged against the policy each month—if the policy lacked sufficient funds for such charges, it would lapse. *Id.* The cost of insurance was to be set by Jefferson Pilot. *Id.* at 3–14. The Policy stated that "[m]onthly cost of insurance rates will be determined by Us [Jefferson Pilot, Lincoln] based on future expectations as to investment earnings, mortality experience, persistency, a provision of amortization of sales charges, expenses (including reinsurance costs) and taxes." *Id.* at 14.

The Derricks thereafter paid $1,667.00 per month in policy premiums for the next sixteen years. Dkt. 21 at 3. Lincoln, having merged with Jefferson Pilot in 2008, sent Annual Policy Summaries to the Derricks each year. *Id.* These summaries detailed the investment performance of the funds in the Policy, the cost of insurance being charged, and the annual accumulation of the Policy's value. It also included a projection of the policy's value for the following year. *See* Dkt. 21-4.

The cost of insurance began steadily increasing the year after the Policy began (as is typical with life insurance), from $14,729.19 for the 2001–02 period to $82,596.60 for the 2016–17 period when the policy eventually lapsed. Dkt. 21-4 at 1, 16. And although the investment portion of the policy performed well for the first several years, reaching an accumulation value of $154,810.31 in 2007, the Policy began steadily losing value in 2008, which was also the period that Jefferson Pilot merged with Lincoln. Dkt. 21-4. By 2007, at the high point of the Policy's value, Jefferson Pilot had the Annual Cost of Insurance set at $22,457.23. Dkt. 21-4 at 6.

3

Over the course of the next several years, the investment continued to earn a positive rate of return for the most part—it took a calamitous 39 percent drop in 2009, but saw a 53.7 percent return the following year, ultimately averaging a 7-percent yearly increase over the policy's life—but the overall value continued to decline. Dkt. 21-4 at 8–16. The accumulation value of the policy began to drop as well. *Id.* During the first seven years of the policy's life, when it was controlled by Lincoln, the cost of insurance increased by approximately 62 percent. *Id.* at 1–8. From the period during which Lincoln took control of the policy (2007–08) to its eventual default in 2017, the cost of insurance ("COI") increased from $23,810.73 to $82,598.60, an increase of approximately 346 percent. *Id.* at 8–16.

On August 22, 2016, Lincoln sent a letter to Mrs. Derrick stating that "your Life Insurance policy does not have enough value to cover the monthly expense due on August 21, 2016. We are concerned that your policy will lapse without value on October 27, 2016 unless the required payment is made. The minimum payment due is $22,459.52." Dkt. 20-36. The following month, after the Derricks again paid just $1,667 in premiums, Lincoln again mailed Mrs. Derrick to "detail[] the current amount(s) you may pay to maintain this policy." Dkt. 21-5. "The minimum additional payment required to cover the overdue monthly deduction for August, September and October is $20,218.00 . . . . Please note that once we receive your additional payment and your policy is no longer in the Grace Period, we will adjust your planned monthly premium amount to $7,295.00 effective November 21, 2016." *Id*. The Derricks paid premiums at the increased $7,295 rate for the following year, but then ceased payments in December 2017, allowing the policy to lapse with no cash value. Dkt. 21 at 4. By then, the Derricks had paid $529,572.13 in premiums on the Policy, not including the $115,000 paid into the plan at its opening. *Id.*

The Derricks sued Crawford and Lincoln in the Rockbridge Circuit Court, alleging that Lincoln, through Crawford, fraudulently induced the Derricks to acquire an insurance policy materially different than they were made to understand. Dkt. 1-2. This one-count complaint originally sought relief for fraudulent inducement, though the Derricks now seek relief for constructive fraud. *See* Dkt. 1-2, 21 at 5. The Derricks ask this court to award injunctive relief either by rescinding the policy and ordering the return of $622,903.05 (with interest) or reinstating the contract at a set $1,667 premium and ordering the return of the $56,280.00 paid at the higher premium. Dkt. 1-2 at 8.

Crawford and the Derricks then reached a settlement for $75,000 in exchange for Crawford's release from any liability. Dkt. 21 at 5. Lincoln then removed the case to federal court, asserting diversity jurisdiction. Dkt. 1.

Defendant now moves for summary judgment on the Derricks' one-count complaint. Dkt. 20. Defendant disagrees that any false misrepresentations were actually made, and that regardless, such misrepresentations would not excuse the fact that Plaintiffs bound themselves by the language of the policy contract. Furthermore, Lincoln argues that the Derricks' claim is both time-barred and blocked by the doctrine of laches. Finally, Lincoln argues that when the Derricks settled their claim against Crawford, their settlement released Lincoln from liability as well. The motion is now fully briefed and ripe for review.

## II.     Standard of Review

Federal Rule of Civil Procedure 56(a) provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering cross-motions for summary judgment, the court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Defs. of Wildlife v. N.C. DOT*, 762 F.3d 374, 392 (4th Cir. 2014).

### III. Discussion

Constructive fraud, also referred to as negligent misrepresentation, requires the same showing as a claim for actual fraud, except "the plaintiff is only required to plead that the false representation was made innocently or negligently." *Sales v. Kecoughtan Hous. Co.*, 690 S.E.2d 91, 94 (Va. 2010). [A]ll other elements remain the same." *Id*. However, under Virginia law, the claim must also arise from a breach of a common law or statutory duty, rather than one arising from the virtue of a contractual relationship between the parties. *Abi-Najm v. Concord Condo., LLC*, 699 S.E.2d 483, 489 (Va. 2010); *Dunn Constr. Co. v. Cloney*, 682 S.E.2d 943, 946 (Va. 2009). As a result, the Derricks must prove the following by clear and convincing evidence to ultimately succeed on their claim:

> (1) A false representation of material fact;
>
> (2) Made innocently or negligently;
>
> (3) in breach of a common law or statutory duty;
>
> (4) reliance by Plaintiff on this misrepresentation; and
>
> (5) Damages

*Abi-Najm,* 699 S.E.2d at 489.

a.  False representation of a material fact

"An action based on fraud may not be predicated on unfulfilled promises or statements about future events." *Sales*, 690 S.E.2d at 94. Further, the statement that serves as the foundation for an action in fraud, either actual or constructive, must be a misrepresentation of an existing fact and not the expression of an opinion. *Id.* (citing *McMillion v. Dryvit Systems, Inc.*, 552 S.E.2d 364, 368–69 (Va. 2001)). Whether a statement is one of fact or one of opinion is determined on a case-by-case basis, "taking into consideration the nature of the representation and the meaning of the language used as applied to the subject matter and as interpreted by the surrounding circumstances." *Id.* at 94–95.

The Derricks rely heavily on the Supreme Court of Virginia's decision in *Nationwide Ins. Co. v. Patterson*, which held that an insurance agent's erroneous opinion as to the meaning of an insurance policy, when reasonably relied upon, can indeed trigger actionable constructive fraud. 229 S.E.2d 490 (Va. 1985). In *Nationwide*, the insurance agent represented to the plaintiff that the pertinent health insurance policy's "stop loss" feature would pay all additional expenses above $1,000, but in actuality, the policy actually stated that it would pay 100 percent of "all *eligible* expenses." *Id.* at 491 (emphasis added). The *Nationwide* court rejected the defendant's contention that the agent's statement "was not actionable because it was a mere expression of opinion." *Id.* at 493. *Nationwide* stated that "where the parties are on unequal terms even an opinion can be actionable." *Id.* It continued: "Here, Huffman was an insurance professional, a longtime Nationwide agent, while Patterson, his customer, was a layman." *Id.*

This case is distinguishable in a number of ways from the present case. First, "the written information supplied to [the plaintiff by the agent] stated that if [plaintiff] had any questions he was to contact his agent. In essence, [defendant] directed [plaintiff] to rely on [the agent] to explain

7

the policy." *Id*. at 492. The Derricks point to no such instance where the policy incorporated Crawford's opinion or statements in construing the policy.

More importantly, unlike the statements in *Nationwide*, the Derricks plainly cannot prove that Crawford's statements were a *false* representation. That is because they were mere predictions of what was *probable* to occur. The Derricks identify two representations by Crawford on which they relied in purchasing the policy. First, Crawford told them that "the $1,667.00 planned periodic payment was *likely* sufficient to maintain the Policy benefits through the time of H.E. Derrick, Jr.'s death." Dkt. 21 at 2 (citing Dkt. 20-39 at 2) (emphasis supplied). Second, Crawford told them that "in the event additional premiums were required, the increases *should* not be substantial." *Id.* (emphasis supplied). The Derricks' briefing identifies no other allegedly false representations upon which they relied. *See id*.

These statements were not falsities. They were predictions of what was probable to occur. Crawford could have indeed been correct that "the $1,667.00 planned periodic payment was likely sufficient to maintain the Policy benefits through the time of H. E. Derrick, Jr.'s death." Just because the payments were ultimately insufficient does not mean, at the time, it was unlikely that they would be sufficient. This differs from the representations made in *Nationwide*, where the defendant's agent told the plaintiff that the health insurance policy would cover all additional expenses beyond $1,000, not that it would "likely" cover all additional expenses, or that it "should" cover all additional expenses. *Nationwide Ins. Co.*, 229 S.E.2d at 491. Indeed, courts applying Virginia law have dismissed complaints of constructive fraud as mere promises or predictions of a future occurrence where the alleged statement was far more concrete than the Derricks allege here. *See e.g. Whalen v. Rutherford*, 86 Va. Cir. 560 (Va. Cir. 2011) ("In the complaint, Ms. Whalen alleges that she conveyed a joint interest in the real estate to Mr. Rutherford based upon

8

his promise to marry her."); *Fransmart, LLC v. Freshii Dev., LLC*, 768 F. Supp. 2d 851, 865 (E.D. Va. 2011) ("Freshii claims that during the negotiation process Rowe represented that Old Fransmart would market and sell franchises for Freshii using a model for franchise growth and expansion.").

Crawford's words were mere predictions about what was probable to occur. As a result, even if *Nationwide* provides that opinions are actionable in certain circumstances,[1] such circumstances do not extend here. The Derricks fail to put forth sufficient evidence showing a "false representation of material fact," which justifies awarding Lincoln summary judgment.

b. Breach of duty imposed by law / Economic Loss Rule

To state an actionable claim for constructive fraud under Virginia law, the claim must also arise from a breach of a common law or statutory duty, rather than one arising from the virtue of a contractual relationship between the parties. *Abi-Najm*, 699 S.E.2d at 489; *Dunn Constr. Co.*, 682 S.E.2d at 946. In neither their complaint nor in their briefing opposing this motion do the Derricks offer argument (let alone evidence) that Crawford breached a duty owed to the Derricks.

Under Virginia Law, "[t]he duty not to defraud is owed by everyone to everyone, regardless of any special relationship between he alleged tortfeasor and victim," *Jordan v. Osmun*, No. 1:16-cv-501, 2016 WL 7173784, at *7 (E.D. Va. Dec. 8, 2016), but this is actionable through *actual*,

---

[1] The Court also notes that Virginia jurisprudence regarding fraud has evolved in the years since *Nationwide* was decided. First, modern courts apply a much more exacting analysis to the reliance prong, treating it as reasonable reliance. *Wynn's Extended Care, Inc. v. Bradley*, No. 5:13-CV-00114, 2014 WL 2197715, at *3 (W.D. Va. May 27, 2014); *Elliott v. Great Point Partners, LLC*, No. 1:10-CV-1019, 2011 WL 63657, at *5 (E.D. Va. Jan. 5, 2011). Furthermore, as discussed in the following section, courts now require that plaintiffs identify a statutory or common law duty that defendant breached *other than* the duty not to defraud on which plaintiffs bringing actual fraud claims may rely. *See Abi-Najm*, 699 S.E.2d at 489; *Dunn Constr. Co.*, 682 S.E.2d at 946.

not constructive fraud. "The existence of a general tort duty, owed by everyone to everyone, to refrain from constructive fraud has been implicitly repudiated by the Virginia Supreme Court, which has, on numerous occasions, rejected constructive fraud claims on the basis that a common law duty did not exist between the contracting parties." *Huntington Ingalls Inc. v. Travelers Indem. Co.*, No. 4:18-cv-147, 2019 WL 5580226, at *5 (E.D. Va. Oct. 29, 2019) (citing *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998); *MCR Fed., LLC v. JB&A, Inc.*, 808 S.E.2d 186, 193 (Va. 2017)).

"[L]osses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of the law of contract." *Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 613 (Va. 2004). The economic loss rule prohibits the recovery of "'purely economic losses' in a tort action simply by recasting a contract claim as a tort claim." *Waytec Elec. Corp.*, 459 F. Supp. 2d at 491 (citing *Sensenbrenner v. Rust, Orling & Neale Architects, Inc.*, 236 Va. 419, 374 S.E.2d 55, 57 (Va. 1988)). The purpose of the rule is to preserve the contract-tort distinction in the common law. "The law of torts is well equipped to offer redress for losses suffered by some reason of a 'breach of some duty imposed by law to protect the broad interests of social policy.' Tort law is not designed, however, to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Sensenbrenner*, 374 S.E.2d at 58 (quoting *Kamlar Corp. v. Haley*, 299 S.E.2d 514, 517 (Va. 1983)).

In order to determine whether a claim is subject to the restrictions imposed by the economic loss rule, a court must first determine the nature and source of the duty allegedly violated. *McDevitt Street Bovis, Inc.*, 507 S.E.2d at 347. If the duty does not exist absent an agreement establishing that duty, then it is a duty based in contract. If the duty arises from the relationship of the parties irrespective of any agreement, then any action for breach of that duty sounds in tort. *Oleyar v.*

10

*Kerr*, 217 Va. 88, 225 S.E.2d 398, 399–400 (Va. 1976). "Thus, if, when the surface is scratched, it appears that the defendant has breached a duty imposed by law, not by contract, the economic loss rule should not apply." *Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438, 446 (4th Cir.1990).

Fraud in the inducement, although related to contract, still sounds in tort. "The general rule is that fraud must relate to a present or pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements of future events." *Soble v. Herman*, 9 S.E.2d 459, 464 (Va.1940). Virginia law, however, "'distinguishes between a statement that is false when made and a promise that becomes false only when the promisor later fails to keep his word. The former is fraud, the latter is breach of contract.'" *Madison Mgmt. Group*, 918 F.2d at 447 (quoting *Lissmann v. Hartford Fire Ins. Co.*, 848 F.2d 50, 53 (4th Cir.1988)). The "critical inquiry . . . is whether the defendant's statement . . . was false when made." *Lissman*, 848 F.2d at 53. Indeed, when a party "makes a promise, intending not to perform, his promise is a misrepresentation of *present* fact, and if made to induce the promisee to act to his detriment, is actionable as an actual fraud." *Colonial Ford Truck Sales, Inc. v. Schneider*, 325 S.E.2d 91, 94 (Va. 1985).

The question then is how this rule applies to the Derricks' constructive fraud claim. Constructive fraud is premised upon innocent or negligent misrepresentation of a material fact. Courts have held that such claims are "nothing more than a claim of negligence." *Va. Transformer Corp. v. P.D. George Co.*, 932 F. Supp. 156, 163 (W.D. Va. 1996). As a negligence claim, it may only survive the economic loss rule if the duty violated existed in law and not solely under an agreement between the parties. *Oleyar*, 225 S.E.2d at 399–400.

11

In *Filak v. George*, the plaintiffs entered into an insurance contract on the advice of defendant insurance agent. The defendant represented that the policy would pay out certain benefits, and the plaintiffs relied upon defendant's representations to enter into the contract. *Filak,* 594 S.E.2d at 611–613. When the insurer ultimately failed to perform in accordance with the defendant's representations, the plaintiffs filed a constructive fraud suit against the defendant, arguing that the defendant had a "'common law duty' to be truthful to them." *Id.* at 613. The court rejected the plaintiffs' arguments, holding that the only duty that the defendant owed to the plaintiffs was assumed in the contract between the parties. Negligent failure to satisfy that duty was a mere breach of contract and not constructive fraud. *Id.* at 613–14.

The *Filak* court's reasoning applies directly to the instant case. The Derricks' constructive fraud claim amounts essentially to a claim of negligence. Yet, the Derricks have made no attempt to identify any statutory or common law duty Lincoln and Crawford breached. In this absence, the duty exists apparently only between the parties by nature of their agreement. Negligent failure to perform that duty sounds in contract and not in tort. To hold otherwise "would emasculate the economic loss rule." *Va. Transformer Corp.*, 932 F. Supp. at 163. Therefore, independent of the Derricks' inability to show a false representation of material fact, the economic loss rule stands to bar the Derricks' constructive fraud claim.

### IV. Conclusion

Making all reasonable inferences in the Derricks' favor, the Court concludes based on the foregoing that no reasonable trier of fact could find that Crawford made a false representation of material fact. Furthermore, because the Derricks fail to identify any statutory or common law duty Crawford owed to them outside their contractual relationship, the economic loss rule bars their

claim. For both these reasons, Lincoln is entitled to summary judgment, and the Derricks' complaint must be dismissed with prejudice.

The Clerk of the Court is directed to send a copy of the Memorandum Opinion to all counsel of record. An accompanying Order shall issue.

Entered this 29th day of July, 2020.

*Norman K. Moon*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE